**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Sarah Chuba, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Covenant Health, Inc., and St. Joseph Healthcare Foundation,<br><br>Defendants. | Case No.<br><br>**JURY DEMAND** |

**CLASS ACTION COMPLAINT**

Plaintiff Sarah Chuba ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint on behalf of herself and a class of all similarly situated persons against Defendants Covenant Health, Inc. ("Covenant"), and St. Joseph Healthcare Foundation ("St. Joseph") (collectively, "Defendants"). Plaintiff bases the within allegations upon personal information and belief, the investigation of counsel, and states the following:

## INTRODUCTION

1. Plaintiff brings this Class Action Complaint on behalf of herself and a class of nearly 500,000 similarly situated individuals whose Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (together, "Sensitive Information") was accessed by cybercriminals and exfiltrated from Defendants' systems from May 18 to May 26, 2025 (the "Data Breach").

2. Plaintiff brings this Class Action Complaint on behalf of a class of persons impacted by Defendants' failure to safeguard, monitor, maintain, and protect highly sensitive PII

and PHI. Defendants collected, stored, and maintained Plaintiff's and the Class's Sensitive Information as part of their business activities as healthcare service providers.

3. Covenant is "a family of innovative Catholic health care organizations," comprised of "hospitals, skilled nursing and rehabilitation centers, assisted living residences" across "New England and part of Pennsylvania."[1]

4. Specifically, Covenant operates 10 skilled nursing facilities, four assisted living facilities, two living facilities, 100 physician practices and clinics, and three acute care hospitals.

5. St. Joseph is part of the Covenant network.[2]

6. St. Joseph is a non-profit healthcare corporation located in Bangor, Maine, and operates an acute care hospital alongside six outpatient locations.[3]

7. As a healthcare provider, Defendants collect a variety of Sensitive Information, including patients' date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history. In the wrong hands, such sensitive and personally identifying information may be wielded to cause significant harm to the patients whose information was stolen.

8. Defendants know that as healthcare providers, they are required to protect patients' Sensitive Information.

9. Indeed, Covenant acknowledged its commitment "to protecting the confidentiality of [patients'] health information" and meeting the standards imposed by the Health Insurance

---

1 *Who We Are*, COVENANT HEALTH, https://perma.cc/BY2X-CCNR (last visited Jan. 14, 2026).

2 *About Us*, ST. JOSEPH HEALTHCARE, https://stjosephbangor.org/about-us/ (last visited Jan. 15, 2026).

3 *Id.*

Portability and Accountability Act of 1996, 45 C.F.R. §160.102 ("HIPAA"), and its related Security regulations.[4]

10. Likewise, St. Joseph informs patients that patients have a right to the "confidentiality of an information and records."[5]

11. Defendants failed to make good on their promises.

12. The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities, including financial and medical fraud and identity theft. Indeed, a driving purpose of these types of data breaches is to obtain and misuse victims' Sensitive Information or to make it available on the dark web for misuse. Information such as the Sensitive Information accessed during the Data Breach may also be used to fraudulently obtain medical services, or to perform additionally targeted phishing or hacking attacks directed at the victims of the Data Breach. Consequently, all impacted individuals are at a heightened and substantial risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

13. Plaintiff Chuba was a patient at St. Joseph's facilities and was impacted by the Data Breach. Plaintiff remains at a continued risk of harm due to the exposure and potential misuse of her personal data by criminal hackers.

14. As such, Plaintiff brings this Complaint on behalf of persons whose Sensitive Information was stolen during the Data Breach.

## JURISDICTION

---

4 *Privacy Policy*, COVENANT HEALTH, https://covenanthealth.net/privacy-policy/ (last visited Jan. 15, 2026).

5 *St. Joseph Healthcare Patient Rights and Responsibilities*, ST. JOSEPH HEALTHCARE, https://stjosephbangor.org/wp-content/uploads/2023/04/SJH-Patient-Rights-Responsibility-Poster-FINAL-032022.pdf (last visited Jan. 15, 2026).

15. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(d), the Class Action Fairness Act of 2005, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, at least one plaintiff class member will be diverse from Defendant because the class includes patients from Maine, Massachusetts, New Hampshire, and Pennsylvania.

16. This Court has personal jurisdiction over Defendants because they maintain their principal places of business in this judicial District, conduct significant business in Massachusetts, and/or otherwise have sufficient minimum contacts with, and intentionally avail themselves of, the markets in Massachusetts.

17. This Court is the proper venue for this case pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because Defendants conduct a substantial part of their business and are headquartered within this District.

## PARTIES

18. **Plaintiff Sarah Chuba** is a citizen of Dixmont, Maine, and a patient of Defendants. Defendants obtained and maintained the Sensitive Information of Plaintiff and owed her a legal duty and obligation to protect and secure that Sensitive Information from unauthorized access or disclosure.

19. Plaintiff Chuba received notice of the Data Breach from Defendants in early January 2026. Plaintiff Chuba suffered actual injury from having her Sensitive Information exposed as a result of the Data Breach, including: (a) time and effort monitoring her accounts for fraudulent charges and to mitigate the risk of harm from the Data Breach; (b) entrusting Sensitive

Information to Defendants that she would not have had Defendants disclosed that it lacked data security practices adequate to safeguard its patients; (c) damages to, and diminution in the value of, her Sensitive Information—a form of intangible property that she entrusted to Defendants as a condition of receiving healthcare services; (d) loss of her privacy; and (e) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

20. **Defendant Covenant** is incorporated in Massachusetts, with its principal place of business at 40 Shattuck Road, Ste. 317, Andover, Massachusetts 01810. Covenant Health, Inc., is a citizen and resident of the state of Massachusetts.

21. **Defendant St. Joseph** is a full-service, not for profit health care system located in Bangor, Maine, and maintains its headquarters and principal place of business at 360 Broadway, Bangor, Maine, 04401.

## FACTUAL ALLEGATIONS

### A. Defendants Collect Sensitive Information from Users

22. Defendants are large and experienced healthcare service providers with decades of experience in the healthcare industry across several states.

23. As a regular part of the services that they provide to patients, Defendants maintain patients' highly sensitive personal information. Indeed, to obtain services from Defendants, patients, like Plaintiff and the Class, must provide their medical providers with highly sensitive information, including PII, PHI, or both. As massive healthcare service providers, Defendants have collected and maintained an enormous depository of Sensitive Information of over 500,000 patients, which acts as a particularly lucrative, and foreseeable, target for data thieves looking to obtain and misuse or sell patient data.

24. Upon information and belief, through their own privacy policies and through their health care providers, Defendants represented to Plaintiff and the Class that their Sensitive Information would be kept confidential and not disclosed to unauthorized third parties.

25. Plaintiff and the Class had a reasonable expectation that Defendants would protect the Sensitive Information that they collected and maintained, especially because, given the publicity of other data breaches and the significant impact they had, Defendants knew, or should have known, that failing to adequately protect their information could cause substantial harm.

26. As described throughout this Complaint, Defendants did not reasonably protect, secure, or store Plaintiff's and the Class's Sensitive Information prior to, during, or after the Data Breach, but rather enacted unreasonable data security measures that they knew, or should have known, were insufficient to reasonably protect the highly sensitive information Defendants maintained. Consequently, cybercriminals circumvented Defendants' security measures, resulting in a significant data breach.

**B. Defendants' Inadequate Data Security Measures Exposed Patients' Sensitive Data**

27. According to Defendants' notice letter disclosing the Data Breach:

> On May 26, 2025, Covenant Health was alerted to unusual activity in its Information Technology ("IT") environment. Covenant Health immediately worked to secure and restore its systems and engaged industry-leading third-party information technology and forensic specialists to conduct a thorough investigation into the source and extent of the incident, including the amount and type of data that may have been affected. Through that investigation, Covenant Health learned that an unauthorized party gained access to its IT environment on May 18, 2025, and was able to access some patient information.[6]

[6] Security Breach Notifications, Appendix, OFF. OF THE ME. ATT'Y GEN., https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2817 (last visited Jan. 15, 2026).

28. Defendants further stated that "[o]n June 25, 2025, Covenant Health first learned the information related to 4,659 Maine residents, and may have included their names and Social Security numbers."[7] On July 11, 2025, Covenant began mailing letters to these individuals.

29. On December 31, 2025, Defendants updated their notice letter. This time, Defendants stated that "[s]ince the July notice . . . Covenant Health continued to analyze the involved data analysis. The involved data included patients' names and one or more of the following: addresses, dates of birth, medical record numbers, Social Security numbers, health insurance information, and treatment information, such as diagnoses, dates of treatment, and/or type of treatment."[8] Plaintiff did not receive her notice letter until early January 2026.

30. Neither the first nor the second drafts of the letters informed Plaintiff or the Class of the critical details relating to the ransomware attack.

31. Specifically, neither letter informed Plaintiff and the Class that the ransomware attack was carried out by a group of cybercriminals known by the name "Qilin."[9]

32. Qilin's "tactics, techniques, and procedures involve data theft and file encryption with ransomware, and when the ransom is not paid, data is leaked on its dark web data leak site."[10]

---

7 *Id.*

8 Security Breach Notifications, Appendix, OFF. OF THE ME. ATT'Y GEN., https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3471 (last visited Jan. 15, 2026).

9 Steve Alder, *Covenant Health Ransomware Attack Victim Count Increases by 5,980%*, HIPAA J. (Jan. 5, 2026), https://www.hipaajournal.com/covenant-health-cyberattack/.

10 *Id.*

33. Indeed, Qilin did initially place Plaintiff's and the Class's information for sale on their website.[11] In doing so, Qilin claimed that it had stolen 852 GB of data comprising nearly 1.35 million files.[12]

34. The hackers' access to this Sensitive Information was made possible by, and caused by, Defendants' failure to use reasonable security procedures and practices, especially given the sensitivity of the information that it was maintaining.

**C. Defendants Knew They Needed to Protect Users' Sensitive Data**

35. As healthcare service providers, Defendants knew, or should have known, that they needed to implement measures to adequately protect sensitive data.

36. Defendants have received ample warning of the need to protect sensitive data.

37. For example, U.S. Federal Trade Commission ("FTC") has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[13] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover

---

[11] *Id.*

[12] Ionut Ilascu, *Covenant Health says May data breach impacted nearly 478,000 patients*, BLEEPINGCOMPUT. (Jan. 2, 2026), https://www.bleepingcomputer.com/news/security/covenant-health-says-may-data-breach-impacted-nearly-478-000-patients/.

[13] *Start with Security A Guide For Business, Lessons Learned from FTC Cases*, FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[14]

38. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the Federal Trade Commission Act of 1914, 15 U.S.C. §45 ("FTCA" or "FTC Act").

39. As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋7 (F.T.C. June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋7 (F.T.C. Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (F.T.C. July 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (F.T.C. May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access

---

[14] *Id.*; *Protecting Personal Information, A Guide For Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

between instore networks . . .”). These orders, which all preceded Defendants’ Data Breach, further clarify the measures businesses must take to meet their data security obligations.

40. HIPAA also placed Defendants on notice as to their obligations to maintain secure networks.

41. Defendants are covered by HIPAA and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (“Standards for Privacy of Individually Identifiable Health Information”), and Security Rule (“Security Standards for the Protection of Electronic Protected Health Information”), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

42. These rules establish national standards for the protection of patient information, including personal health information, defined as “individually identifiable health information” which either “identifies the individual” or where there is a “reasonable basis to believe the information can be used to identify the individual,” that is held or transmitted by a healthcare provider. 45 C.F.R. §160.103.

43. HIPAA limits the permissible uses of “protected health information” and prohibits unauthorized disclosures of “protected health information.”[15]

44. HIPAA requires that Defendants implement appropriate safeguards for this information.[16]

45. Defendants were especially on notice of the need to safeguard data because of the history of data breaches in the healthcare industry, which is particularly susceptible to cyberattacks.

[15] 45 C.F.R. §164.502.

[16] 45 C.F.R. §164.540(c)(1).

46. According to a report from the Identity Theft Resource Center, in the first half of 2025 there were 1,732 publicly reported data breaches, including 283 healthcare data breaches.[17]

47. As healthcare service providers ranging across several states and serving hundreds of thousands of patients, Defendants knew, or should have known, the importance of protecting the Sensitive Information entrusted to them. Defendants also knew, or should have known, of the foreseeable and catastrophic consequences if their systems were breached. Despite this, Defendants failed to take reasonable data security measures to prevent or mitigate losses from cyberattacks.

48. Defendants could have minimized or altogether prevented the Data Breach by taking reasonable steps to properly secure and encrypt the Sensitive Information of Plaintiff and the Class and by maintaining a reasonable information retention policy to delete unnecessary patient information.

49. Given the duration and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that Defendants knew, or should have known, created a significant risk of harm to hundreds of thousands of individuals.

50. In all, Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks;
- failing to meet the standards established by their data-security and privacy policies;

---

[17] *Identity Theft Resource Center Sees Acceleration of 2024 Data Breach Trends in First Half of 2025*, IDENTITY THEFT RES. CTR. (July 16, 2025) https://www.idtheftcenter.org/post/h1-2025-data-breach-report-data-breach-trend-continues/.

- failing to adequately protect PII and PHI entrusted to them;
- failing to properly monitor their own data security systems for existing intrusions;
- failing to ensure that their vendors with access to their computer systems and data employed reasonable security procedures;
- failing to train their employees in the proper handling of emails containing PII and maintain adequate email security practices; and
- failing to adhere to industry standards for cybersecurity.

51. Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class members' Sensitive Information by allowing cyberthieves to access Defendants' computer network and systems which contained unsecured and unencrypted Sensitive Information.

**D. Defendants' Data Breach Harmed Plaintiff and the Class**

52. Plaintiff's and the Class's data exposed in the Data Breach constitute the type of data specifically targeted by, and valuable to, hackers.

53. Indeed, hackers increasingly sell these sensitive records on the black market to purchasers who seek to use the personally identifying information to create fake IDs, make fraudulent transactions, obtain loans, or commit other acts of identity theft.[18] Medical identity theft "is also more difficult to detect, taking almost twice as long as normal identity theft."[19] In warning consumers of the dangers of medical identity theft, the FTC states that an identity thief may use personal information "to see a doctor, get prescription drugs, buy medical devices, submit

---

[18] *How do hackers make money from your stolen data?*, EMSISOFT (Feb. 20, 2020), https://blog.emsisoft.com/en/35541/how-do-hackers-make-money-from-your-stolen-data/.

[19] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. FORUM (Dec. 12, 2017), https://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

claims with your insurance provider, or get other medical care."[20] The FTC also warns, "[i]f the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[21]

54. A report published by the World Privacy Forum[22] and presented at the FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services not sought or received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

20 *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, PUB. INTEL., at 14 (Apr. 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/.

21 *See What to Know About Medical Identity Theft*, FED. TRADE COMM'N, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Jan. 15, 2026).

22 Dixon & Emerson, *supra* note 19.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgages or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

55. Beyond monetary losses and healthcare fraud, data breaches also have a deep, psychological impact on their victims.

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you and prolong or worsen a cyber attack.[23]

56. Plaintiff and the Class suffered injuries in a number of ways, including:

- loss of benefit of their bargain, for individuals who provided compensation to entities to safely transfer and store their data with one of the Defendants or Defendants' vendors;
- loss of value of their personal information, in that it has been misused for purposes to which they did not consent, and they have not been properly compensated for this misuse;
- actual or attempted fraud, misuse, or identity theft caused by the Data Breach, including, but not limited to, their information being published to the clear, deep, and dark web; as well as

---

[23] Amber Steel, *The Psychological Impact of Cyber Attacks*, LASTPASS (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

- time and expenses that were reasonably spent to mitigate the impact of the breach, including the cost of credit monitoring.

57. The harm already suffered by Plaintiff demonstrates that the risk of harm to Plaintiff and Class Members is present and ongoing.

58. The risk of identity theft after a data breach is lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web[—as is the case in this Data Breach—]fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[24]

**E. Plaintiff's Experience**

59. Plaintiff was a patient of Defendants for nearly a decade. Over that decade, as a condition of receiving health care, Plaintiff Chuba provided Defendants with her highly personal information, including PII and PHI as described in the foregoing paragraphs. Defendants maintained access to and control over this Sensitive Information. Plaintiff Chuba expected that her Sensitive Information would remain safeguarded and would not be accessible by unauthorized third parties.

60. However, in early January 2026, Plaintiff Chuba received notice from Defendants that Defendants' networks had been breached.

61. The notice letter informed her that her Sensitive Information, including her address, date of birth, medical record number, health insurance information, and treatment information,

---

[24] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, REPORT TO CONGRESSIONAL REQUESTERS (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

such as diagnoses, dates of treatment, and/or type of treatment had been exposed in the Data Breach.

62. Plaintiff Chuba is very careful about sharing and protecting Sensitive Information. Plaintiff has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured channel.

63. Plaintiff Chuba suffered actual injury from having her sensitive information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) mitigation efforts, including monitoring of Plaintiff's credit and account and other efforts to ensure that her information is not being used for financial, medical, and identity theft or fraud, and the time and expense thereof; (b) damages to, and diminution of, the value of her Sensitive Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; and (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

64. In addition, knowing that hackers accessed her Sensitive Information and that this likely has been and/or will be used in the future for financial, medical, and identity theft has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

65. Despite Defendants' failure to reasonably protect Plaintiff's and the Class's Sensitive Information, it has not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class face.

**CLASS ALLEGATIONS**

66. Plaintiff brings this action on behalf of herself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Nationwide Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to Defendants' Data Breach.

67. Excluded from the class are Defendants and its subsidiaries and affiliates; all employees of Defendants; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

68. Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

69. **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are nearly 500,000 members of the Class. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

70. **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a. whether Defendants knew, or should have known, that their data environment and cybersecurity measures created a risk of a data breach;

b. whether Defendants controlled and took responsibility for protecting Plaintiff's and the Class's data when they solicited that data, collected it, and stored it on their servers;

c. whether Defendants' security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d. whether Defendants owed Plaintiff and the Class a duty to implement reasonable security measures;

e. whether Defendants' failure to adequately secure Plaintiff's and the Class's data constitutes a breach of their duty to institute reasonable security measures;

f. whether Defendants' failure to implement reasonable data security measures allowed the breach of their data systems to occur and caused the theft of Plaintiff's and the Class's data;

g. whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h. whether Plaintiff and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their data systems; and

i. whether Plaintiff and the Class are entitled to relief.

71. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons who provided data to Defendants, whose data resided on Defendants' servers, and whose Sensitive Information was exposed in Defendants' Data Breach. Plaintiff's injuries are similar to other Class members and Plaintiff seeks relief consistent with the relief due to the Class.

72. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendants to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

73. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

74. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

75. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

76. Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data they solicited from Plaintiff and the Class and managed and stored. This duty arises from multiple sources.

77. Defendants owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. Defendants alone controlled their technology, infrastructure, and cybersecurity. They further knew, or should have known, that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, Defendants knew, or should have known, that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendants' unsecured, unreasonable data security measures.

78. Additionally, Section 5 of the FTCA required Defendants to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendants' duty to Plaintiff and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect sensitive data. Defendants, therefore,

were required and obligated to take reasonable measures to protect data they possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendants acted in violation of Section 5 of the FTCA.

79. Defendants are obligated to perform their business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

80. Finally, Defendants assumed the duty to protect patients' sensitive data by soliciting, collecting, and storing users' data and, additionally, by representing to patients that they would keep their data safe.

81. Defendants breached their duty to Plaintiff and the Class by implementing unreasonable data security measures that they knew, or should have known, could cause a data breach. Defendants knew, or should have known, that hackers might target sensitive data that Defendants solicited and collected on their users and, therefore, needed to use reasonable data security measures to protect against a data breach.

82. Defendants were fully capable of preventing the Data Breach. Defendants, as healthcare providers, knew, or should have known, of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and

shortened the scope of the Data Breach. Defendants thus failed to take reasonable measures to secure their systems, leaving them vulnerable to a breach.

83. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

**COUNT II**
**Negligence *Per Se***

84. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

85. Defendants' unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

86. Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect users' sensitive data. The FTC publications and orders described above also form the basis of Defendants' duty.

87. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the sensitive nature and amount of data they stored on their users and the foreseeable consequences of a data breach should Defendants fail to secure their systems.

88. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

89. Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over 50 enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

90. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered and continue to suffer injury.

**COUNT III**
**Declaratory and Injunctive Relief**

91. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

92. Under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

93. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

94. Pursuant to its authority under the Federal Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed, and continue to owe a legal duty to secure the sensitive information with which they are entrusted, specifically including patients' personal and health information, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b. Defendants breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure their customers' personal information; and

c. Defendants' breach of their legal duty continues to cause harm to Plaintiff and the Class.

95. The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its users' (i.e., Plaintiff's and the Class's) data.

96. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

97. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

98. Issuance of the requested injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of herself and the Class, requests that this Court award relief as follows:

A. An Order certifying the class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

B. An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

C. A declaratory judgment in favor of Plaintiff and the Class;

D. Injunctive relief to Plaintiff and the Class;

E. An award of attorneys' fees and costs as allowed by law; and

F. An award of such other and further relief as the Court may deem necessary or appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial for all the claims so triable.

Dated: January 16, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Joseph P. Guglielmo
Joseph P. Guglielmo (BBO #671410)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444

Facsimile: (212) 223-6334
jguglielmo@scott-scott.com

Brian C. Gudmundson (*pro hac vice forthcoming*)
Madison M. DeMaris (*pro hac vice forthcoming*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
madison.demaris@zimmreed.com

*Counsel for Plaintiff and the Proposed Class*